Filed 1/27/23 In re E.P. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re E.P. et al., Persons Coming Under the Juvenile Court Law. | D080757 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. SJ13124B-D) |
| v. | |
| V.R., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Michael P. Pulos, Judge. Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

This case follows a familiar pattern. A dependency case is initiated because the parent suffers from a significant substance abuse disorder. Reunification services include substance abuse treatment, but for any number of understandable reasons the parent makes inconsistent progress in treatment for their addiction, often experiencing relapses. Ultimately, reunification services are discontinued and a hearing is set to terminate parental rights. In the meantime, the children who are the subject of the dependency petition have adjusted reasonably well to placement with a prospective adoptive family.

But initial struggles in treatment often provide the foundation for later success. And when the parent sees some initial progress, they typically file a petition under Welfare and Institutions Code[1] section 388 seeking to forestall the anticipated adoption by modifying the existing juvenile court orders. These petitions invoke our fundamental need to believe in the resilience of the human spirit, and nearly always involve difficult (and sometimes heart-wrenching) decisions by juvenile court judges in light of constantly evolving circumstances. The decisions require judges to critically assess the parent's progress in recovery in conjunction with the children's need for permanence and stability. Demanding as it is, this evaluation is one that the juvenile court is best suited to make.

In this case, V.R. (Mother) appeals a juvenile court order summarily denying her section 388 petition as to three of her minor children. Her petition requested modification of a March 2021 order that found return of the children to Mother would be detrimental to the children's physical or emotional well-being. Mother also challenges the juvenile court's order

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

terminating her parental rights under section 366.26. She contends the court should have applied the beneficial parent-child relationship exception to adoption pursuant to section 366.26, subdivision (c)(1)(B)(i)). Relying on the thoughtful judgment of the dependency judge, we disagree and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In 2019, Mother and J.P. (Father) lived together with their three minor children—E.P. (three years old), M.P. (one year old), and A.P. (born in September 2019) (collectively, the children).[2] In October 2019, A.P.'s umbilical cord tested positive for methamphetamine shortly after his birth. A referral was made to the San Diego County Health and Human Services Agency (Agency), and Mother admitted she used methamphetamine during and after her pregnancy with A.P.

Approximately one month after A.P.'s birth, police responded to the family's residence to address a call regarding domestic violence. When they arrived, Father was inside the home with the children but Mother was not present. Police searched the home and found drug paraphernalia within reach of the youngsters. Father was arrested and the children were taken to their grandparents' homes.

Some three weeks later, the Agency filed juvenile dependency petitions alleging the children were within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b). Specifically, the petitions claimed the children suffered, or were at substantial risk of suffering, serious physical harm as a result of Mother's continuing drug use. They also referenced a prior dependency case in which Mother's child tested positive for

---

[2] Father is not a party to this appeal and will be discussed only when relevant.

3

methamphetamine at his birth in 2015.[3] The petitions asserted that Mother continued to use drugs despite participating in treatment programs in her prior dependency case.

A. *Initial Dependency Proceedings*

The juvenile court addressed the dependency petitions at the detention hearing in early November. The court made prima facie findings on the petitions and detained the children at Polinsky Children's Center or an approved foster home. It ordered supervised visitation with the children and voluntary services for the parents. The matter was then set for a jurisdiction and disposition hearing.

In the month following the detention hearing, Mother repeatedly failed to attend her scheduled visits with the assigned social worker. But in December 2019, Mother expressed interest in receiving inpatient substance abuse treatment. She enrolled in a drug treatment program and obtained a sponsor, later transitioning to a different program. The juvenile court then ordered the parents to participate in dependency drug court.

At the jurisdiction and disposition hearing in February 2020, the juvenile court made true findings on the petitions and declared the children dependents of the juvenile court. They were formally removed from the

---

[3]    Mother's prior dependency case involves a minor who is not the subject of this appeal, but who is referenced by the parties and in the record as evidence of Mother's extensive history of drug use. The record demonstrates that, as part of the prior dependency case, the Agency offered Mother substance abuse treatment services. Initially, Mother was compliant with the programs offered to her by the Agency and she completed a drug treatment program and parenting classes. But she failed to maintain consistency in the treatment services and drug testing, and the child was ultimately placed with his father. A.P. was born with methamphetamine in his system approximately two months after this child was removed from Mother's custody.

parents' custody and placed in a foster home. The court ordered the Agency to provide the parents with reunification services and set the matter for subsequent review hearings.

B. *Review Hearings*

For several months following the jurisdiction and disposition hearing, Mother maintained employment and pursued therapy, drug treatment, and parenting classes. She also participated in dependency drug court and submitted negative drug tests. Mother received positive feedback from her service providers and the Agency allowed her to have unsupervised visits with the children. But in early August 2020, Mother relapsed and admitted to methamphetamine use.

The Agency submitted a status review report to the juvenile court that documented Mother's treatment progress and subsequent relapse. At the six-month review hearing in August 2020, the juvenile court found that Mother's progress toward alleviating or mitigating the causes leading to the children's placement was adequate. It ordered the Agency to continue to provide reunification services to Mother.

Prior to the 12-month review hearing, the Agency submitted a status review report and addendum report to the juvenile court. In the reports, the Agency documented Mother's failure to maintain consistent contact with the Agency. It further reported that Mother struggled to maintain her sobriety, continued to use drugs, and inconsistently participated in drug court. While Mother did reenter a drug treatment program in early 2021, she was later discharged from the program and again lost contact with the Agency. The Agency recommended that the juvenile court terminate reunification services and set the matter for a section 366.26 hearing.

At the 12-month review hearing in March 2021, the juvenile court found that return of the children to Mother's custody would create a substantial risk of detriment to the children's physical or emotional well-being. It also determined that the Agency had provided the parents with reasonable reunification services, but that the parents had made minimal progress. Accordingly, the court terminated reunification services for both parents and set the matter for a section 366.26 hearing.

C. *Children's Progress During the Reunification Period*

During the reunification period, the children were placed in separate foster homes, and each child required additional care and services. E.P. exhibited speech and developmental delays and had behavioral problems that affected his ability to interact with his caregivers, siblings, and peers. As a result, he required behavioral and occupational therapy. M.P. had medical issues related to a fibrous cyst, and he received speech therapy and other services through the San Diego Regional Center. A.P. displayed motor delays and was not appropriately meeting the expected milestones for a child of his age. He received physical therapy to improve his development and other services through the San Diego Regional Center.

In March 2021, the Agency indicated that the children were receiving the appropriate care and services to meet their needs and were doing well in their respective foster homes. E.P. was enrolled in preschool and was reportedly having fewer behavioral outbursts. M.P. was attending both preschool and speech therapy, and he was able to use two-word phrases and sign language. A.P. was receiving physical therapy and had started to walk.

D. *Section 366.26 Hearing and Section 388 Petition*

    1. *Addendum Reports*

In preparation for the section 366.26 hearing, the Agency asked for several continuances to pursue adoption options for the children. During this time, the Agency submitted several addendum reports that were entered into evidence at the section 366.26 hearing without objection. The addendum reports documented that the children's maternal great-aunt, C.G., expressed interest in adopting them. C.G. underwent an assessment process with the Agency and in January 2022 all three children were placed in her custody. Thereafter, C.G. reported that the children were bonded with her and doing well. She regularly followed-up with the children's recommended services, therapies, and school meetings. C.G. confirmed that she was motivated to adopt the children and she completed classes related to their adoption.

The addendum reports further discussed the children's relationship with Mother. C.G. said that only E.P. remembered his parents because M.P. and A.P. were very young when they were placed in foster care. She indicated that after M.P. and A.P. interacted with Mother, they were able to transition back to her care without concern. In contrast, when E.P.'s visits with Mother concluded, he became upset and asked to go home with her. C.G. observed Mother and E.P. tell each other "I love you" and "I miss you," and she believed they shared a loving relationship.

The Agency reported that Mother struggled to maintain her sobriety during this timeframe. In January 2022, she gave birth to another child who tested positive for controlled substances. But following the birth of this child, Mother stopped using drugs, completed a three-month residential treatment program, and transitioned to outpatient treatment. During her treatment, she continued to have in-person and telephonic visitation with the children.

7

In the addendum reports, the Agency described Mother's hard work in her treatment program. Even so, it expressed concern about Mother's ability to maintain her sobriety outside the structured environment of an inpatient treatment program. The Agency also stated that although they appeared to enjoy their visits with Mother, the children did not seek her out to meet their needs. The reports noted that the children were doing well with C.G., who continued to pursue their adoption. Consequently, the Agency concluded that the benefits of adoption outweighed the value of a continued relationship between Mother and the children.

2. *Section 388 Petition*

A day prior to the July 2022 section 366.26 hearing, Mother filed a section 388 modification petition. The petition sought to change the March 2021 order finding that placement of the children with Mother was detrimental to the children. Mother asked the juvenile court to return placement of the children to her.[4]

In support of her petition, Mother provided letters from her drug treatment program and a drug court representative. The letters confirmed that Mother completed a residential program in April 2022 and was engaged

[4] In her opening brief, Mother construes her section 388 petition to include a request for additional reunification services and further visitation with the children. The Agency contends Mother forfeited this claim because she failed to raise the issue with the juvenile court. We disagree with the Agency's contention. The juvenile court was required to liberally construe the section 388 petition in favor of its sufficiency. (*In re D. R.* (2007) 155 Cal.App.4th 480, 487.) Under this standard, Mother's request to modify the March 2021 order encompassed the interrelated orders within the document, including the order terminating reunification services. If the juvenile court had concluded that return of the children to Mother was appropriate, this would have affected other orders within the same document, including the order terminating reunification services. Accordingly, we conclude the issue was not forfeited.

in her outpatient program. She also provided proof of negative drug tests and a declaration that she had been sober since January 2022. Mother further stated she was employed and living in a sober living home that would allow the children to reside with her.

After hearing argument from the parties, the juvenile court concluded that Mother did not make a prima facie showing of changed circumstances, and accordingly denied the petition. It specifically found that the circumstances related to Mother's drug use were changing—but not sufficiently changed—to warrant a modification of the prior order. While the court did commend Mother's treatment progress in the six months prior to the section 366.26 hearing, it explained that a six-month period of sobriety was relatively short given Mother's long history of substance abuse. The court ultimately determined it was not in the best interests of the children to modify the order due to the length of the case and the children's need for permanence and stability.

3. *Section 366.26 Hearing*

After denying the section 388 petition, the juvenile court proceeded to address the termination of parental rights. Without objection, the Agency offered into evidence the section 366.26 report and seven addendum reports. Mother, Father, and a social worker assigned to the children's case also testified.

The social worker testified that the benefits of adoption for the children outweighed the value of a continued relationship with Mother. Specifically, she noted that E.P. did not cry or ask for Mother when he was home with C.G. because he had become acclimated to being away from his parents. The social worker further explained that while there was an initial adjustment period for M.P. when he began living with his siblings, C.G. provided a safe,

9

family-oriented environment with which he ultimately became comfortable. As to A.P., the Agency believed that C.G. provided him with the medical and therapeutic services he needed to feel safe and stable.

The social worker also indicated that the children's caregiver and prospective adoptive parent—their maternal great-aunt—was hopeful the children would continue to have contact and a relationship with Mother. Still, the juvenile court acknowledged that it could not presume the relative caregiver would allow the parental relationship to continue following adoption. The social worker responded by stating that, even assuming the children's adoptive parents did not allow the children to have contact with Mother, the benefits of adoption outweighed a continued parental relationship.

Mother also testified. She acknowledged her battle with addiction but maintained she would like to be sober and a part of her children's lives. She indicated that during her visits with the children, they called her "Mom" and gave her hugs and kisses. Mother went on to discuss an incident that led to the termination of her visits with the children at their visitation center. She admitted answering her cellphone during a visit with the children, but explained that the call was from the house manager at her sober living home regarding a potential COVID-19 exposure.

After the conclusion of evidence, Mother asked the juvenile court to find that the beneficial parent-child relationship exception to adoption applied. She argued that her visitation with the children was largely consistent throughout the case and a continued parental relationship would benefit the children. She relied on the fact that the children were excited to see her during their visits and maintained that terminating their relationship would

10

be detrimental. Mother accordingly requested that the court order a guardianship in lieu of adoption.

In making its ruling, the juvenile court noted that the evidence clearly showed the parents loved the children, and the children had affection for their parents. Addressing the legal and factual issues presented by the case, it found that the children were both generally and specifically adoptable. The court then proceeded to address Mother's argument regarding the beneficial parent-child exception to adoption. It recognized that the exception included three elements: (1) regular visitation and contact; (2) a beneficial parental relationship; and (3) overall detriment to the children from a termination of that relationship.

Although it termed both issues "close," the juvenile court found that Mother had met her burden as to each of the first two elements. It concluded, however, that the third element had not been proven by a preponderance of the evidence. The court framed the dispositive issue as follows: "Does the benefit of placement in a new adoptive home outweigh the harm the children would experience from the loss of a significant, positive, emotional relationship with the parent?" In discussing this inquiry, the court reiterated that the evidence clearly showed the parents loved the children. But it then weighed this finding against the benefits of stability and permanency that had been sought for the children from the inception of the case. The juvenile court ultimately concluded that the benefits of adoption outweighed the detriment of ending the parental relationship. In ordering the termination of parental rights, it found by clear and convincing evidence that none of the exceptions in section 366.26, subdivision (c)(1) applied, and that adoption was in the best interests of the children.

DISCUSSION

A. *Section 388 Petition*

Mother argues the juvenile court erred by summarily denying her section 388 petition without first conducting an evidentiary hearing. She contends she presented abundant evidence of changes she made in her life since the March 2021 order finding that return of the children to her custody would be detrimental. Specifically, Mother asserts that evidence of her sobriety, completion of a drug treatment program, housing, and employment constituted sufficiently "changed circumstances" that would justify modification of the prior court order. She also maintains that modification of the March 2021 order was in the best interests of the children because it would have allowed the children to continue their relationship with and be raised by their own mother.

The Agency responds that Mother failed to make a prima facie showing of changed circumstances sufficient to justify modification of the juvenile court's order. It notes that Mother was offered substance abuse treatment in a prior dependency case, as well as in this case, and she nonetheless failed to maintain her sobriety. While it commended Mother's recent six-month period of sobriety, the Agency argued that relative to the length of Mother's history of drug use, her recent sobriety constitutes "changing" rather than "changed" circumstances. It further contends that modification of the order was not in the children's best interests because it would disrupt the stability the children experienced with their caregiver.

Section 388, subdivision (d), allows for the modification of a juvenile court order when "the best interests of the child or nonminor dependent may be promoted by the proposed change of order. . . ." (§ 388, subd. (d).) A petition to modify the court's order under section 388 must: (1) present new

12

evidence or a change of circumstances; and (2) demonstrate that a modification of the order is in the children's best interests. (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 6–7; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) A section 388 petition should be liberally construed in favor of its sufficiency. (*In re D. R.* (2007) 155 Cal.App.4th 480, 487.) However, once reunification services are terminated, the juvenile court's focus is on the children's needs for " 'permanency and stability.' " (*Stephanie M.*, at p. 317.)

The moving party is entitled to an evidentiary hearing on the section 388 petition if they have made a prima facie showing of the two requisite elements. (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.) A prima showing is made when "the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Ibid.*) " '[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition.' [Citations.]" (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.) The juvenile court may consider the entirety of the "factual and procedural history of the case" in determining whether a prima facie showing has been made. (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) We review an order summarily denying a section 388 petition without an evidentiary hearing under an abuse of discretion standard. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1158.)

With respect to the first element, the change in circumstances alleged in support of a section 388 petition must be substantial in nature. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 (*Ernesto R.*).) "A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification

13

services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*In re J.M.* (2020) 50 Cal.App.5th 833, 846.) Evidence of changing, rather than changed, circumstances is insufficient to justify the modification of a prior order under section 388. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 482; *Ernesto R.*, at p. 223.) "In the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*In re N.F.* (2021) 68 Cal.App.5th 112, 121; see also *Ernesto R.*, at p. 223 [for the purposes of a section 388 petition, the parent's recent sobriety reflected changing, rather than changed circumstances, where the parent had a history of drug relapses, was in the early stages of recovery, and was still addressing a chronic substance abuse problem].)

The juvenile court found that Mother's recent sobriety and progress in her treatment programs constituted circumstances that were in the process of changing, but had not yet changed. Admittedly, where exactly that tipping point lies will depend on a host of subtle factors unique to the individual case, and we must necessarily defer to the court's familiarity with the parties and experience with the dependency case. Here, while praising Mother's efforts, the dependency judge emphasized that her six-month period of sobriety and participation in drug treatment was relatively short when compared with her extensive history of substance abuse.

We conclude the record supports the juvenile court's findings. Although Mother's recent commitment to her sobriety is unquestionably commendable, the evidence shows she had a history of relapse following her participation in treatment programs. This is not to be critical of Mother;

relapse is often part of the recovery process. Yet it represents a particular danger for the children.

Mother's most recent relapse occurred in January 2022 after she participated in both inpatient and outpatient treatment programs. Following that relapse, she gave birth to her third drug-exposed child. As the juvenile court observed, Mother's six-month period of sobriety is relatively brief when compared with her extensive history of drug use and suggests she is still in the early stages of her recovery. Thus, the court did not abuse its discretion in concluding that Mother's section 388 petition alleged, at most, changing rather than changed circumstances.

Moreover, even if circumstances had changed, Mother must also allege a set of new circumstances indicating that modification of the prior order would be in the children's best interests. Because she filed her section 388 petition after reunification services were terminated, Mother's "interest in the care, custody and companionship of the child[ren] [was] no longer paramount. Rather, at this point 'the focus shift[ed] to the needs of the

child[ren] for permanency and stability . . . .' "[5] (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)  The children's best interests are not served by "further delay[ing] permanency and stability in favor of rewarding Mother for her hard work and efforts to reunify."  (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.)

When Mother filed her section 388 petition—over a year after reunification services were terminated—the children had lived out of Mother's custody since 2019.  M.P. and A.P. lived away from Mother from most of their lives, and E.P. lived away from Mother for one-half of his life.  The children's caregiver reported that M.P. and A.P. did not remember their parents because they were too young when they were removed from Mother's custody.  And while E.P. did share a loving relationship with Mother, he did not ask for her or cry when she was not present.

By contrast, the children had been living together and doing well in their caregiver's home.  They all required and were regularly receiving additional services to meet their needs.  The evidence demonstrated that the

---

[5]    In support of her argument that modification of the prior order was in the children's best interests, Mother relies on the factors articulated in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, a case involving unsanitary conditions in the mother's home.  She nonetheless recognizes that courts have declined to apply the *Kimberly F.* factors because they do not focus on the permanency and stability of the children after reunification services have been terminated.  (See *In re J.C.* (2014) 226 Cal.App.4th 503, 527 [declining to apply the *Kimberly F.* factors because they did not take the Supreme Court's *Stephanie M.* analysis into account].)  In this case reunification services were already terminated when Mother filed her section 388 petition, and we therefore decline to apply the *Kimberly F.* factors.  But even were we to apply them, they do not assist Mother.  The evidence in this case demonstrated that her extensive history of drug use was unlikely to be easily ameliorated—a finding that demonstrates modification was not in the children's best interests under the *Kimberly F.* analysis.

children had achieved a great sense of stability and permanency with their caregiver after spending at least one-half of their lives in the custody of foster families. Thus, the record supports the juvenile court's finding that modifying the prior order posed a risk to the stability of the children and was not in their best interests.

Accordingly, we conclude the juvenile court did not abuse its discretion in denying Mother's section 388 petition.

B. *Section 366.26 Hearing*

Mother argues the juvenile court erred in failing to apply the beneficial parent-child relationship exception to overcome the statutory preference for adoption. She contends she provided sufficient proof that all three prongs of the exception were satisfied. The Agency acknowledges that the juvenile court found the first two prongs of the exception were proven. It contends, however, that Mother failed to satisfy the third prong and, therefore, the exception is inapplicable. We conclude the juvenile court did not abuse its discretion when it declined to apply the exception and terminated Mother's parental rights.

" 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.]" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224 ( *In re B.D.*).) Once the juvenile court finds the child is adoptable, the burden then shifts to the parent to demonstrate the application of a statutory exception to adoption. (*Id.* at p. 1225; § 366.26, subd. (c)(1).) If the parent does not establish the applicability of a statutory exception, the juvenile court must terminate parental rights. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)

17

One such statutory exception is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) This exception applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This exception requires the parent to prove three elements: "1) regular visitation and contact with the child, taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence." (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1225 [citing to *In re Caden C.* (2021) 11 Cal.5th 614, 639–640 (*Caden C.*)].) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will not disturb the juvenile court's findings even where substantial evidence to the contrary also exists. (*Caden C.*, at p. 640, citations omitted.) " '[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion.' (*Ibid*.)" A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

At the outset, we note that the juvenile court found Mother proved the first and second prongs of the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) The Agency does not contest the juvenile court's findings as to these elements. We accordingly focus on the third element.

The third element of the beneficial parent-child exception requires the juvenile court to determine whether terminating the parental relationship would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]" (*Id.* at p. 632.) This requires the juvenile court to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) The juvenile court must then weigh the loss of this relationship with "the benefit of placement in a new, adoptive home . . . ." (*Ibid.*)

Although the third element of the beneficial parent-child exception is the only element at issue in this case, the second and third elements of the exception "significantly overlap." (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 317, fn. 7.) "[F]or example, evidence that terminating parental relation would cause harm indicates that child would lose important relational benefits if severed from parent." (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.) A parent's struggles in dealing with the issues that led to dependency—in this case drug addiction—"can be relevant

19

in assessing whether the interaction between parent and child 'has a " 'negative effect' " on the child.' [Citation.]" (*In re D.P.* (2022) 76 Cal.App.5th 153, 165.) But this inquiry is significant only to the extent it "informs the central question before the court: '[W]ould the child benefit from continuing the relationship and be harmed, on balance, by losing it?' [Citation.] " (*Id.* at p. 165)

Here, the juvenile court meticulously and insightfully weighed the relevant facts in rendering its final determination that the beneficial parent-child exception was not applicable. The court discussed the loving relationship between Mother and the children, and commended Mother's recent efforts in maintaining sobriety. But the record fully supports its ultimate determination that any harm caused by the termination of the children's relationship with Mother was outweighed by the substantial benefits the children received through the permanency of adoption. The court noted that the children "need the most permanence that the law can give them," and adoption provides the best chance to achieve it.

Since the children's placement with C.G., their great-aunt and prospective adopter, the children made demonstrable progress in a stable home. When they received consistent services and therapy in their foster homes, E.P. was observed to have fewer behavioral issues, M.P. made advancements in his verbal development, and A.P. began walking. C.G. ensured the children consistently received the necessary services and therapy to meet their needs. The children were bonded with C.G. and she enthusiastically pursued their adoption.

By contrast, evidence of the children's beneficial relationship with Mother was not so strong as to outweigh the benefits of the children's placement in this stable adoptive home. Although Mother's strongest

relationship appeared to be with E.P., he did not cry or ask for Mother when he was away from her and at home with C.G. The social worker testified that E.P. was acclimated to not being around his parents. C.G. reported that M.P. and A.P. did not remember Mother because they were so young when they were taken from her custody.

Perhaps most pertinent, the benefit of Mother's continued relationship with the children was significantly diminished by her history of drug use. Throughout the dependency case and for the majority of the children's lives, Mother struggled to maintain her sobriety and inconsistently participated in the treatment programs offered to her. She used drugs while pregnant with A.P. despite participating in a treatment program related to her prior dependency case. In January 2022, within months of the section 366.26 hearing, Mother gave birth to another child who was born exposed to drugs.

While Mother recently completed a drug treatment program and professed a commitment to her sobriety, her prior history reflected efforts at treatment followed by relapse. The record demonstrated that, during periods when Mother admitted to using drugs, she inconsistently communicated with the Agency and cancelled visits with the children. This "one step forward, two steps back" pattern is hardly surprising for persons who struggle with addiction. But it is also undeniable that Mother's historical inability to address her drug dependency has had a demonstrably negative effect on her relationship with the children.

Considering the totality of the evidence, we conclude the juvenile court did not abuse its discretion when it found the benefits of adoption outweighed the detriment of terminating the children's relationship with Mother. Accordingly, the juvenile court did not abuse its discretion when it declined to apply the beneficial parent-child exception and terminated parental rights.

DISPOSITION

The juvenile court's orders denying Mother's section 388 petition and terminating Mother's parental rights are affirmed.

DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DO, J.